**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| NATHAN FISCHER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>MARATHON HEALTH, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Nathan Fischer ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this Class Action Complaint against Defendant Marathon Health, LLC ("Marathon Health" or "Defendant"), and alleges, upon personal knowledge, counsel's investigation, and information and belief, as follows.

## INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard the sensitive information of Plaintiff and other similarly situated current and former patients, including employees of Marathon Health's client organizations and their family members, and other individuals whose information Marathon Health maintained ("Class Members," defined *infra*), including personally identifiable information ("PII") like names, dates of birth, contact information, and Social Security numbers, as well as protected health information ("PHI") like

diagnosis and/or treatment information, medical information, and health insurance information (PHI and PII together, "PII/PHI" or "Private Information").[1]

2. Healthcare entities that handle PII and PHI owe a non-delegable duty to the individuals to whom that data relates. This duty arises because it is foreseeable that its exposure to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the individuals to whom the information relates.

3. The harm resulting from a data breach manifests in a number of ways, including identity theft and financial or medical fraud. The exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take additional prophylactic measures.

4. Defendant Marathon Health, headquartered in Indianapolis, Indiana, provides employer-sponsored "advanced primary care for organizations—with onsite, nearsite, and network centers, plus virtual care nationwide."[2] Upon information and belief, Marathon Health serves a patient base of approximately three million individuals.

5. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed a resulting duty to secure, maintain, protect, and safeguard the Private Information with which it was entrusted against unauthorized access and disclosure through adequate security measures. Defendant is also aware that PII and PHI are highly

---

[1] Marathon Health, *Notice of Data Breach* (Oct. 29, 2026), https://oag.ca.gov/system/files/Marathon_California%20Notification.pdf.

[2] *Home*, MARATHON HEALTH, https://marathon.health/ (last visited Nov. 9, 2026).

valuable to cybercriminals, making it foreseeable that Defendant would be the target of a cyberattack.

6. Despite Defendant's duty to safeguard the PII and PHI with which it was entrusted, and the foreseeability of a data breach, Plaintiff's and Class Members' Private Information stored by Defendant was accessed and acquired when, on August 24, 2026, an unauthorized individual posing as a Marathon Health IT worker obtained an employee's credentials, used them to access a cloud-hosted application, and exported information within a few hours (the "Data Breach" or "Breach").[3]

7. As a direct and proximate result of Defendant's failure to implement and follow basic, standard security procedures, Plaintiff's and Class Members' PII and PHI have been compromised by cybercriminals and disclosed to unauthorized persons. Plaintiff and Class Members have suffered harm and remain at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal activity—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

8. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption

[3] Marathon Health, *supra* note 1.

of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

9. Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure its network containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

10. Plaintiff and Class Members have suffered injuries as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of Plaintiff and all similarly situated persons whose Private Information was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

11. Plaintiff, individually and on behalf of the Class, brings claims against Defendant for negligence, declaratory judgment, breach of fiduciary duty, breach of express contract, breach of implied contract, unjust enrichment, violation of the Indiana Deceptive Consumer Sales Act,

and violation of the Florida Deceptive and Unfair Trade Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

12. Plaintiff Nathan Fischer is, and at all relevant times was, a resident and citizen of the State of Florida, residing in Davenport, Florida.

13. Plaintiff received healthcare services from Marathon Health. Believing Marathon Health would implement and maintain reasonable security and practices to protect his PII/PHI, Plaintiff provided his PII/PHI to Marathon Health in connection with receiving healthcare services. Had Plaintiff known that Marathon Health does not adequately protect PII/PHI, he would not have used Marathon Health's services or provided it with his PII/PHI.

14. Defendant Marathon Health, LLC is a Delaware limited liability company with its principal place of business at 10 W. Market Street, Suite 2900, Indianapolis, Indiana 46204. Marathon Health may be served through its registered agent, Cogency Global, Inc., 150 W. Market Street, Suite 400, Indianapolis, Indiana 46204.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class has more than 100 members; and at least one Class Member, including Plaintiff, a citizen of Florida, is a citizen of a State different from Defendant. Under 28 U.S.C. § 1332(d)(10), Defendant is a citizen of Delaware, its State of organization, and Indiana, where it has its principal place of business.

16. Upon information and belief, fewer than two-thirds of the members of the proposed Class are citizens of Indiana. Marathon Health operates health centers in numerous States, and it reportedly notified approximately 5.7 million individuals nationwide of the Data Breach. Accordingly, none of the exceptions to CAFA jurisdiction in 28 U.S.C. § 1332(d)(3)–(4) applies.

17. This Court has general personal jurisdiction over Defendant because its principal place of business is in Indianapolis, Indiana, and it conducts substantial business in this District.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant resides in this District, and a substantial part of the events or omissions giving rise to the claims occurred here, including the data security decisions that led to the Data Breach. Venue is proper in the Indianapolis Division because Defendant's principal place of business is in Marion County.

## FACTUAL ALLEGATIONS

### A. Defendant Collected and Stored Plaintiff's and Class Members' PII and PHI

19. Marathon Health is a provider of employer-sponsored advanced primary care, operating onsite, nearsite, and network health centers and a virtual care platform for employers, labor groups, and public-sector organizations nationwide.

20. In the regular course of its business, Defendant collects and maintains the PII/PHI of its patients, former patients, employees of its client organizations and their family members, and other persons to whom it is currently providing or previously provided healthcare-related services.

21. Defendant requires patients to provide it with their Private Information before it provides healthcare-related services. Upon information and belief, that information includes, *inter alia*, names, dates of birth, contact information, and Social Security numbers, as well as diagnosis

and/or treatment information, medical information, and health insurance information. Defendant stores this information digitally, including in back-end health care operations databases and cloud-hosted applications.

22. Plaintiff and Class Members entrusted Defendant with their sensitive and confidential PII and PHI and, therefore, reasonably expected that Defendant would safeguard their highly sensitive PII and keep their PHI confidential.

23. Due to the sensitivity of the PII and PHI that Defendant handles, collects, and stores, Defendant was aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

24. By requesting, obtaining, collecting, storing, and deriving benefits from Plaintiff's and Class Members' PII and PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

25. Marathon Health is well aware of its data security obligations. In its Notice of Privacy Practices, Marathon Health acknowledges that it is "required by law to maintain the privacy and security of your individually identifiable health information." It further promises: "Except as described in this Notice, we may not use or disclose your PHI without your written authorization." None of the permitted disclosures it describes includes disclosure to cybercriminals. Marathon Health's privacy policy center likewise represents that "protecting your privacy is an important part of the care and services we provide."[4]

---

[4] *Notice of Privacy Practices*, MARATHON HEALTH, https://marathon.health/hubfs/2026%20Notice%20of%20Privacy%20Practices/NPP%20English.pdf.pdf (last visited Nov. 9, 2026); *Privacy Policy Center*, MARATHON HEALTH, https://marathon.health/privacy-policy-center (last visited Nov. 9, 2026).

26. Despite Marathon Health's representations and the existence of its duties, it failed to implement reasonable data security measures to protect Plaintiff's and Class Members' PII and PHI and ultimately allowed threat actors to compromise Plaintiff's and Class Members' PII and PHI.

**B. The Risks of Storing Valuable PII and PHI Are Well Known in the Healthcare Industry**

27. Given its frequent handling of sensitive data, Defendant was aware at all relevant times that the PII and PHI that it obtains, collects, stores, uses, and derives a benefit from is highly sensitive and is of significant value to those who seek to use it for wrongful purposes.

28. Defendant also knew that a breach of its data systems, and the exposure of the information stored therein, would result in the imminent risk of identity theft and fraud for the individuals whose PII and PHI were compromised, as well as intrusion into their highly private health information.

29. These risks are not theoretical; in recent years, data breaches at healthcare companies have become ubiquitous, with a new breach seemingly announced every few days.[5] The slew of healthcare data breaches over the last few years has surely put Defendant on notice that its electronic records will be targeted by cybercriminals.

30. PII and PHI have considerable value and constitute enticing and well-known targets for hackers. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such

[5] *See generally* Steve Alder, *Healthcare Data Breach Statistics*, HIPAA J. (Feb. 26, 2026), https://www.hipaajournal.com/healthcare-data-breach-statistics/.

commerce."[6] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

31. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[7]

32. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2025, the Federal Trade Commission's Consumer Sentinel Network received 6.2 million reports of some form of identity fraud compared to 5.3 million in 2022.[8]

33. The healthcare industry in particular has become a prime target for threat actors: "Cyber attacks occur in every industry and sector. However, healthcare organizations are at special risk, largely due to the fact that the information they produce and manage is a particularly alluring target for attackers."[9] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software

---

[6] Brian Krebs, *The Value of a Hacked Company*, KREBS ON SEC. (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[7] *2024 Global Threat Intelligence Report*, FLASHPOINT (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[8] *Consumer Sentinel Network Data Book 2021–2025*, FED. TRADE COMM'N, https://public.tableau.com/app/profile/federal.trade.commission/viz/ConsumerSentinel/Infographic (last visited Nov. 9, 2026).

[9] *The Healthcare Industry Is at Risk*, ORDR (Feb. 20, 2024), https://ordr.net/learn/healthcare-cyber-attacks/.

solutions that have been developed to work on specific—and now obsolete—operating systems and cannot be transferred to supported operating systems."[10]

34. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2024, 6,759 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office for Civil Rights. Those breaches have resulted in the exposure of 846,962,011 individuals, which equates to more than 2.6 times the population of the United States.[11]

35. In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[12] In 2023 alone, about one-third of Americans were affected by health-related data breaches.[13]

36. "In 2024, the protected health information of 276,775,457 individuals was exposed or stolen. On average, that is 758,288 records per day[.]"[14]

---

[10] Steve Alder, *Why Do Criminals Target Medical Records*, HIPAA J. (Jan. 10, 2026), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

[11] Alder, *supra* note 5.

[12] Steve Alder, *Security Breaches in Healthcare in 2023*, HIPAA J. (Jan. 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[13] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA TODAY (Feb. 19, 2024), https://www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.

[14] Alder, *supra* note 5.

37. The breadth of data compromised in the Data Breach here makes the information particularly valuable to cybercriminals and leaves Plaintiff and Class Members especially vulnerable to medical fraud, identity theft, tax fraud, credit and bank fraud, and more.

38. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique SSNs cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in major inconvenience to an individual, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

39. The Social Security Administration warns that the process of replacing a SSN is a difficult one that creates other problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[15]

40. SSNs allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often SSNs can be used to obtain medical goods or

[15] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes SSNs a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

41. **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[16] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[17]

42. Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[18]

43. "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected,

---

[16] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[17] *Managing Cyber Risks in an Interconnected World, Key Findings from The Global State of Information Security® Survey 2015*, PRICEWATERHOUSECOOPERS (Sept. 30, 2014), https://www.pwc.com/ee/et/publications/pub/the-global-state-of-information-security-survey-2015.pdf.

[18] Alder, *supra* note 10.

but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts—far more than is usually possible with stolen credit card information."[19]

44. According to Healthcare Facilities Today:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data [to] open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[20]

45. Even if stolen PII and PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even when cybercriminals do not gain access to a complete set of an individual's PII and PHI during a data breach, cybercriminals can cross-reference two or more sources of PII and PHI to marry data available elsewhere with criminally stolen data,

---

[19] *Id.*

[20] Brian O'Connor, *Healthcare Data Breach: What to Know About Them and What to Do After One*, HEALTHCARE FACILITIES TODAY (June 14, 2018), https://www.healthcarefacilitiestoday.com/posts/Healthcare-data-breach-What-to-know-about-them-and-what-to-do-after-one--18729/.

resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

46. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

47. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take-overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[21] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[22]

48. Based on the value of individuals' PII and PHI to cybercriminals, and the foreseeability of a data breach, Defendant knew or should have known the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences that would arise if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[21] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Dec. 18, 2025), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[22] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

**C. Defendant Breached Its Duties to Protect PII and PHI**

49. According to Marathon Health's own Notice of Data Breach, on August 24, 2026, Marathon Health received an alert of suspicious activity related to one of its employee's accounts. An unauthorized individual posing as a Marathon IT worker obtained the employee's credentials, used those credentials to access a cloud-hosted application, and exported information during that access. By Marathon Health's own account, this all occurred within a few hours on August 24, 2026.[23]

50. Marathon Health did not validate that personal information had been obtained by the unauthorized person until September 9, 2026. Upon information and belief, Marathon Health did not begin mailing notice letters to affected individuals until on or about October 20, 2026, fifty-seven days after it discovered the Breach. Plaintiff's notice letter is dated October 29, 2026, sixty-six days after discovery.

51. The compromised information varied by individual and included names, dates of birth, contact information, Social Security numbers, and diagnosis and/or treatment information. Marathon Health's reports to state regulators indicate that medical information and health insurance information were also involved.

52. Upon information and belief, Marathon Health has reported to state regulators that approximately 5.7 million individuals, residing in all fifty States, are being notified of the Data Breach. If confirmed, the Breach would rank among the largest healthcare data breaches reported in 2026.[24]

---

[23] Marathon Health, *supra* note 1.

[24] Steve Alder, *Marathon Health Data Breach Reportedly Affects 5.7 Million Individuals*, HIPAA J., https://www.hipaajournal.com/marathon-health-data-breach/ (last visited Nov. 9, 2026).

53. The Data Breach was not the product of a sophisticated technical exploit. It was a social engineering attack. An impostor claiming to be from Marathon Health's own IT department convinced an employee to surrender credentials. That single set of credentials was then enough to reach a cloud-hosted application holding the Private Information of millions of people and to export that data in bulk within hours.

54. Impersonating IT or help desk personnel to steal employee credentials is a well-known, widely publicized attack method that has been specifically directed at the healthcare sector. In April 2024, the U.S. Department of Health and Human Services' Health Sector Cybersecurity Coordination Center warned the health sector that threat actors were using social engineering tactics against IT help desks to gain unauthorized access to systems.[25]

55. Upon information and belief, the Data Breach succeeded because Marathon Health failed to implement reasonable safeguards against this known threat, including: (a) training employees to verify the identity of anyone claiming to be IT personnel before sharing credentials; (b) phishing-resistant multi-factor authentication and conditional-access controls that would have prevented a stolen credential from being used by an outsider; (c) least-privilege access controls limiting a single employee account's ability to reach or export Private Information in bulk; (d) data-loss-prevention and anomaly-detection controls capable of identifying and stopping a mass export; and (e) an incident response capability able to act on its own alert before the data left its systems.

---

[25] U.S. DEP'T OF HEALTH & HUM. SERVS., Health Sector Cybersecurity Coordination Ctr., *HC3: Sector Alert, Social Engineering Attacks Targeting IT Help Desks in the Health Sector*, Report No. 202404031000 (Apr. 3, 2024), https://www.hhs.gov/sites/default/files/help-desk-social-engineering-sector-alert-tlpclear.pdf.

56. Marathon Health's response compounds the harm. It offered affected individuals only twelve months of identity monitoring through Epiq. That is plainly inadequate for a breach exposing Social Security numbers and medical information, which can be misused for years.

57. Upon information and belief, as a direct and proximate result of Defendant's failure to implement and maintain adequate security measures, Plaintiff's and Class Members' PII and PHI were exposed to unknown, malicious actors during the Data Breach. It will be nearly impossible for Plaintiff and the Class to ensure that their stolen PII and PHI have been secured and not further disseminated.

**D. Defendant Failed to Comply with HIPAA Requirements**

58. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

59. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology for Economic and Clinical Health Act ("HITECH").[26] *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

60. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

61. HIPAA's Security Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

---

[26] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

62. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

63. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; (ii) maintained in electronic media." 45 C.F.R. § 160.103.

64. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforces.

65. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

66. Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

67. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. § 17902.

68. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400–164.414, also requires Defendant to provide notice of the Data Breach to each affected individual "*without unreasonable delay and in no case later than 60 days following discovery of a breach*."[27] Marathon Health discovered the Data Breach on August 24, 2026. Plaintiff's notice is dated October 29, 2026, more than 60 days after discovery. Upon information and belief, Marathon Health did not begin mailing any notices until on or about October 20, 2026, fifty-seven days after discovery. That is well beyond the 45-day deadline Indiana law imposes for notifying affected individuals. Ind. Code § 24-4.9-3-3.

69. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

70. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

---

[27] *Breach Notification Rule*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Nov. 9, 2026) (emphasis added).

71. HIPAA also requires the Office for Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." U.S. Department of Health & Human Services, Security Rule Guidance Material.[28] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." U.S. Department of Health & Human Services, Guidance on Risk Analysis.[29]

**E. Defendant Failed to Follow FTC Guidelines**

72. Defendant was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

---

[28] *Security Rule Guidance Material*, U.S. DEP'T OF HEALTH & HUM. SERVS., http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Nov. 9, 2026).

[29] *Guidance on Risk Analysis*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Nov. 9, 2026).

73. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

74. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

75. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

76. The FTC further recommends that companies not maintain personal information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

77. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78. These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

79. Defendant failed to properly implement basic data security practices.

80. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

81. Defendant was at all times fully aware of its obligation to protect the Private Information of the individuals about whom it stored such information. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F. Defendant Failed to Comply with Industry Standards**

82. As described above, experts studying cybersecurity routinely identify healthcare providers and their business associates as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

83. Several best practices have been identified that at a minimum should be implemented by HIPAA covered business entities like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

84. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such

as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

85. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

86. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

### G. Defendant Knew That Criminals Target PII/PHI from Healthcare Entities

87. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the date of the breach.

88. At all relevant times, Defendant knew, or should have known, Plaintiff's and all other Class Members' PII/PHI was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyberattacks that Defendant should have anticipated and guarded against.

89. "Hospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[30]

90. Cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, the healthcare compliance company Bluesight found there were 1,160 medical data breaches in 2024, with a staggering 300 million patient records exposed—a 26% increase from 2023.[31]

91. In 2025, the frequency of healthcare data breaches "more than doubled," according to Fortified Health Security's 2026 Horizon Report. Though fewer total patient records were implicated in 2025 medical data breaches as compared to 2024, the "[t]otal breach volume in 2025 surpassed 2024 by 112%[,]" indicating a new trend characterized by "[a]ttacks that come faster, hit more healthcare organizations, and strain teams through repetition rather than scale."[32]

92. Healthcare related breaches, in particular, have continued to rapidly increase because electronic patient data is seen as a valuable asset. In fact, entities that store patient information "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[33]

---

[30] *9 Reasons Why Healthcare Is the Biggest Target for Cyberattacks*, SWIVELSECURE, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Nov. 9, 2026).

[31] *2025 Breach Barometer*, BLUESIGHT (2025), https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf.

[32] Jill Hughes, *2025: Double the Breaches, but Less Patient Data Compromised*, INFORMA TECHTARGET (Jan. 15, 2026), https://www.techtarget.com/healthtechsecurity/news/366637268/2025-Double-the-breaches-but-less-patient-data-compromised.

[33] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF

93. According to a 2025 report released by IBM Security and the Ponemon Institute, "healthcare recorded the highest average breach cost among industries for the 12th consecutive year[,]" and such breaches "took the longest to identify and contain at 279 days."[34]

94. Private Information is a valuable property right.[35] The value of Private Information as a commodity is measurable.[36] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[37] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[38] It is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

---

HEALTHCARE EXEC. (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

[34] *Cost of a Data Breach Report 2025: The AI Oversight Gap*, IBM SEC. & PONEMON INST., https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91 (last visited Nov. 9, 2026).

[35] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFO. & COMMC'N TECH. 26 (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . .").

[36] *See Healthcare Data Breach Statistics 2025: Why Medical Records Are Worth 10× More Than Credit Cards*, PATIENT PROTECT (Nov. 4, 2025), https://www.patient-protect.com/post/healthcare-data-breach-statistics-2025-why-medical-records-are-worth-10-more-than-credit-cards.

[37] ORG. FOR ECON. COOP. & DEV., *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value* (OECD Digital Econ. Papers No. 220, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[38] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

95. As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, SSNs, PHI/PII, and other sensitive information directly on various internet websites, making the information publicly available. This information, from various breaches including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

96. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[39] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[40] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[41]

97. Private information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[42] Experian reports that a stolen credit or debit card number can sell for $10 to $240 on the dark web.[43] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email

---

[39] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAG. (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black).

[40] *Id.*

[41] Elinor Mills, *Study: Medical Identity Theft Is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[42] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[43] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, EXPERIAN (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[44] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[45] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen SSN or credit card number.[46]

98. Criminals can use stolen Private Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[47] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[48]

99. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[49]

---

[44] Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MEDIA (July 16, 2013), https://www.scworld.com/news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[45] *In the Dark*, VPNOVERVIEW.COM, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Nov. 9, 2026).

[46] *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIV. (Apr. 8, 2014), https://nsarchive.gwu.edu/document/18867-national-security-archive-department-justice.

[47] Steger, *supra* note 39.

[48] *Id.*

[49] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, 22 INFO. SYS. RSCH. 254 (2011), https://www.jstor.org/stable/23015560.

100. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

101. Indeed, cyberattacks against the healthcare industry have been common for over ten years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[50]

102. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[51]

103. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in 2020 alone.[52]

104. Defendant was on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The

[50] *Cybersecurity: Threats to the Financial Sector: Hearing Before the Subcomm. on Fin. Insts. & Consumer Credit of the H. Comm. on Fin. Servs.*, 112th Cong. (2011) (statement of Gordon M. Snow, Assistant Director, Cyber Division, Federal Bureau of Investigation), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[51] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[52] Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SEC. MAG. (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[53]

105. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[54]

106. As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiff and Class Members.

107. Defendant was on notice that the federal government has been concerned about healthcare company data encryption practices. Defendant knew its employees accessed and utilized protected health information in the regular course of their duties, yet it appears that information was not encrypted.

108. OCR urges the use of encryption of data containing sensitive personal information. As long ago as 2014, HHS fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan

---

[53] Jim Finkle, *FBI Warns Healthcare Firms That They Are Targeted by Hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[54] Andis Robeznieks, *Cybersecurity: Ransomware Attacks Shut Down Clinics, Hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[55]

109. Additionally, as companies became more dependent on computer systems to run their business,[56] e.g., working remotely as a result of the COVID-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[57]

110. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its server(s), amounting to approximately 5.7 million individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

111. As a HIPAA covered entity, Defendant knew or should have known about its data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in its unprotected files.

112. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

---

[55] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. DEP'T OF HEALTH & HUM. SERVS. (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[56] *Implications of Cyber Risk for Financial Stability*, BD. GOVERNORS OF THE FED. RESERVE SYS. (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[57] *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS SEC. (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

113. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen—particularly SSNs and PHI—fraudulent use of that information and damage to victims may continue for years.

**H. Plaintiff and Class Members Suffered Damages**

114. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and Class Members have already been caused to and must continue to devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

115. Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or protected against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' PII and PHI has been greatly diminished by its exposure in the Data Breach.

116. As a result of Defendant's failures, Plaintiff and Class Members are also at a substantially increased risk of identity theft, fraud, phishing attacks, and related cybercrimes following the Data Breach. Those who are affected experience heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

117. With respect to data breaches specifically in the healthcare sector, a study conducted by researchers from Michigan State University and Johns Hopkins University has found that "[m]ore than 70 percent of hospital data breaches include sensitive demographic or financial information that could lead to identity theft or fraud."[58]

118. Another report stated that, "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[59]

119. The reality is that cybercriminals seek nefarious outcomes from a data breach, and "stolen health data can be used to carry out a variety of crimes."[60]

120. Health information in particular is likely to be used in detrimental ways. Cybercriminals can leverage sensitive personal health details and diagnoses to extort or coerce the victim and commit serious and long-term identity theft.[61]

121. Moreover, many victims of medical identity theft are not aware of the theft until long after it occurs; "[s]omeone may apply for a mortgage, for example, and learn their credit is ruined due to unpaid medical bills for care they didn't receive."[62]

---

[58] *More Than 70% of Hospital Data Breaches Include Sensitive Demographic or Financial Info That Could Lead to Identity Theft*, EUREKALERT! (Sept. 23, 2019), https://www.eurekalert.org/news-releases/484378.

[59] Robert Lemos, *State-Sponsored Cyberattacks Target Medical Research*, DARK READING (Aug. 21, 2019), https://www.darkreading.com/threat-intelligence/state-sponsored-cyberattacks-target-medical-research.

[60] Steger, *supra* note 39.

[61] *Id.*

[62] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

122. Plaintiff and Class Members are at continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect the PII and PHI with which it was entrusted.

123. Additionally, Plaintiff and Class Members have suffered emotional distress, increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers as a result of the Data Breach.

**I.** Plaintiff Nathan Fischer's Experiences

124. Plaintiff Nathan Fischer is a current or former patient of Marathon Health. Plaintiff provided his PII and PHI to Marathon Health to receive its healthcare services.

125. Plaintiff received a Notice of Data Breach from Marathon Health dated October 29, 2026. It informed him that his information "may have been viewed or taken by an unauthorized person," and that the information involved may have included his name, date of birth, contact information, Social Security number, and diagnosis and/or treatment information.

126. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Plaintiff's PII and PHI, Defendant undertook a duty to act reasonably in its handling of Plaintiff's PII and PHI. Defendant, however, did not take reasonable care of Plaintiff's PII and PHI, leading to their exposure and compromise as a direct and proximate result of Defendant's inadequate security measures.

127. Since learning of the Breach, Plaintiff Fischer has been required to spend valuable time and effort attempting to mitigate the harm caused by the Data Breach.

128. As a direct and proximate result of the Data Breach, Plaintiff Fischer has suffered actual injury from having his PII and PHI exposed and/or stolen, including: (a) efforts to mitigate the risk of misuse of his PII and PHI; (b) damages to and diminution of the value of his PII and

PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using it for fraud or publishing the information for sale on the dark web; and (c) a loss of privacy.

129. Since the Data Breach, Plaintiff Fischer has experienced a marked increase in unsolicited spam telephone calls. In response to the Data Breach, he enrolled in credit monitoring services. He has also spent time monitoring his financial accounts and screening his communications to guard against fraud and identity theft.

130. Further, knowing that hackers accessed and possibly exfiltrated his PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff Fischer to experience stress, anxiety, worry, and fear.

131. As a direct and proximate result of the Data Breach, Plaintiff Fischer has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

## CLASS ALLEGATIONS

132. Plaintiff brings this action individually and on behalf of all other similarly situated individuals pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4).

133. Plaintiff seeks to represent a Class of persons to be defined as follows:

> **Nationwide Class:** All individuals in the United States whose PII and/or PHI was accessed, exfiltrated, or otherwise compromised in the Data Breach, including all individuals who were sent a notice of the Data Breach.

> **Florida Subclass:** All individuals residing in Florida whose PII and/or PHI was accessed, exfiltrated, or otherwise compromised in the Data Breach, including all Florida residents who were sent a notice of the Data Breach.

> The Nationwide Class and Florida Subclass are collectively referred to as the "Class."

134. Excluded from the Class is Defendant Marathon Health and its subsidiaries and affiliates, officers and directors, any entity in which Marathon Health has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

135. The proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when Plaintiff moves for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

136. **Numerosity:** The members of the Class are so numerous that the joinder of all members is impracticable. The exact size of the Class and the identities of the individual members are ascertainable through Defendant's records, including but not limited to the files implicated in the Data Breach. Upon information and belief, the Class includes approximately 5.7 million individuals. Class Members are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

137. **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

c. Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII and PHI;

d. Whether Defendant failed to adequately safeguard Plaintiff's and Class Members' PII and PHI;

e. Whether Defendant breached its duty to exercise reasonable care in handling Plaintiff's and Class Members' PII and PHI;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g. Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

h. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

138. **Typicality:** Plaintiff's claims are typical of the claims of Class Members. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

139. **Adequacy:** Plaintiff is an adequate representative of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the Class Members and has no interests antagonistic to the interests of the Class Members. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical, as explained above.

140. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents

fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

141. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

142. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

143. Defendant owed a non-delegable duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII and PHI relating to Plaintiff and the Class in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

144. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII and PHI in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security systems in a timely manner; (c) timely acting upon

warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

145. Defendant's duty to use reasonable care arose from several sources, including but not limited to those identified below.

146. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PII and PHI that are routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats. Defendant alone controlled its own technology, infrastructure, and cybersecurity. Defendant further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and Class Members. Furthermore, Defendant knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and Class Members, was the foreseeable consequence of Defendant's unsecure and unreasonable data security measures.

147. Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's conduct included its failure to adequately restrict access to its computer networks that held Plaintiff's and Class Members' PII and PHI.

148. Defendant's duty also arose from its position as a healthcare business. Defendant holds itself out as a trusted business associate and trusted provider of healthcare and healthcare-related services, thereby assuming a duty to reasonably protect the information it obtains from patients. Indeed, Defendant, which receives, maintains, and handles the PII and PHI with which it

was entrusted, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

149. Defendant is subject to an "independent duty," untethered to any contract between Defendant and Plaintiff and Defendant and Class Members. The sources of Defendant's duties are identified above.

150. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees with access or credentials to systems and databases containing sensitive PII and PHI, including training to detect and resist impersonation of IT personnel and credential-harvesting social engineering.

151. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been accessed and compromised by cybercriminals.

152. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

a. Theft of their PII and PHI;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

h. Damages to and diminution in value of their PII and PHI entrusted to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

153. Defendant's duty of care to use reasonable security measures arose as a result of

the special relationship that existed between Defendant and its patients and the individuals whose Private Information it collected and maintained, which is recognized by laws and regulations, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

154. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT II**
**DECLARATORY JUDGMENT, 28 U.S.C. § 2201, *et seq.***

155. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

156. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, this Court is authorized to declare rights, status, and other legal relations, and to grant further necessary or proper relief based thereon.

157. An actual, present, and justiciable controversy exists between Plaintiff and Class Members, on the one hand, and Defendant, on the other, concerning the adequacy of Defendant's data-security practices and the parties' respective rights and duties with respect to the Private Information that remains in Defendant's possession, custody, or control.

158. Defendant continues to owe Plaintiff and Class Members a duty to protect the Private Information it retains. Plaintiff and Class Members remain at a substantial and imminent risk of further disclosure because their Private Information remains in Defendant's systems, which have already been shown to be vulnerable to compromise.

159. Plaintiff, individually and on behalf of the Class, seeks a declaration that: (a) Defendant's existing data-security measures are inadequate to protect Plaintiff's and Class

Members' Private Information; and (b) to comply with its duties, Defendant must adopt and implement reasonable data-security measures, including, but not limited to, encryption of Private Information at rest and in transit; phishing-resistant multi-factor authentication; identity-verification protocols for IT and help desk requests; least-privilege access controls; data-loss-prevention controls on bulk data exports; network segmentation; routine penetration testing and vulnerability scanning; intrusion detection and prevention; audit logging and continuous monitoring; timely patching; data minimization and retention limits; mandatory employee training; and periodic independent third-party security audits.

160. A declaratory judgment is appropriate and necessary because it will resolve the parties' dispute, guide Defendant's future conduct, and prevent the continuing and future harm threatened by Defendant's inadequate data-security practices.

161. Plaintiff and Class Members are therefore entitled to declaratory relief, together with corresponding injunctive relief requiring Defendant to implement and maintain the data-security measures described above.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

162. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

163. Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

164. As a healthcare provider, Defendant has a fiduciary relationship to its patients. By providing medical treatment and healthcare services for Plaintiff and the Class, Defendant has a

duty to act in good faith and solely for the benefit of Plaintiff and Class Members in all matters related to their healthcare.

165. Defendant is in possession of individuals' PII, PHI, and confidential medical information that are not generally known. Plaintiff did not authorize the disclosure of his PII/PHI to any unauthorized third party.

166. Plaintiff and Class Members neither consented to nor authorized the disclosure of their PII/PHI to a criminal actor.

167. Defendant was negligent in the maintenance of its computer systems in which Plaintiff's and Class Members' PII and PHI were stored. Defendant knew, or should have known, that the private information stored in its systems could be exploited at great cost to Plaintiff and the Class.

168. Plaintiff has suffered concrete injuries as a result of Plaintiff's PII and PHI being exposed in the Data Breach.

169. Plaintiff has dedicated significant time to monitoring financial accounts, enrolling in credit monitoring, and dealing with increased spam calls. As discussed *supra*, cybercriminals may store individuals' PII and PHI for years before using it for fraudulent activity.

170. Beyond the impending risk of identity or medical fraud, Plaintiff and Class Members have suffered emotional distress from the exposure of their private medical information.

171. Further, Plaintiff and Class Members have suffered damage to and diminution of the value of their PII and PHI. Individual pieces of private information such as SSNs have an ascertainable monetary value, as evidenced by the prices cybercriminals charge for them.

172. As a healthcare provider, Defendant breached its fiduciary duty to its patients by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable

internal and external risks to the security, confidentiality, and integrity of patient information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiff's and Class Members' PHI and medical records/information to a criminal third party.

173. Defendant's breach of its fiduciary duty to its patients was a real factor in bringing about Plaintiff's and Class Members' injuries. But for Defendant's failure to properly secure its computer systems, Plaintiff and Class Members would not be required to spend time, money, and effort to protect themselves from imminent fraud.

174. In addition to Defendant's duty to keep Plaintiff's and Class Members' information confidential, Defendant failed to safeguard PII and PHI that Plaintiff and the Class had no choice but to provide to receive medical treatment. Plaintiff and the Class were reliant on Defendant for necessary services. The imbalance of power between Plaintiff and Defendant further indicates that Defendant owed, and subsequently breached, a fiduciary duty to its patients.

175. As a direct and proximate result of Defendant's breach of its fiduciary duty, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**COUNT IV**
**BREACH OF EXPRESS CONTRACT**

176. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

177. Upon information and belief, Plaintiff and Class Members and Defendant entered into written agreements together regarding the medical care or other services that Defendant was to provide to Plaintiff and Class Members upon Plaintiff and Class Members receiving medical services at Defendant's facilities. Plaintiff and Class Members provided Defendant with their PII/PHI as consideration for these agreements, and payment for these services was made directly, through their insurers, or by their employers or plan sponsors on their behalf.

178. Plaintiff and Class Members complied with the express contract when they provided their PII/PHI to Defendant and payment was made to Defendant directly, through their insurers, or by their employers or plan sponsors on their behalf.

179. Defendant breached its obligations under the contract between itself and Plaintiff and Class Members by failing to implement and maintain reasonable security measures to protect and secure their PII/PHI.

180. Alternatively, Plaintiff and Class Members are intended third-party beneficiaries of Marathon Health's agreements with its client organizations to provide healthcare services and to safeguard patient information. Marathon Health breached those agreements by failing to implement and maintain reasonable security measures to protect and secure Plaintiff's and Class Members' PII/PHI.

181. Defendant's breach of the express contract between itself, on the one hand, and Plaintiff and Class Members, on the other hand, directly caused the Data Breach.

182. Plaintiff and all other Class Members were damaged by Defendant's breach of express contracts because: (i) they provided their PII/PHI, and payment was made—directly, through their insurers, or by their employers or plan sponsors on their behalf—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and/or (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT V
## BREACH OF IMPLIED CONTRACT

183. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

184. In connection with receiving medical treatment or services, Plaintiff and all other Class Members entered into implied contracts with Defendant.

185. Pursuant to these implied contracts, Plaintiff and Class Members provided Defendant with their PII/PHI, and payment was made to Defendant directly, through their insurers, or by their employers or plan sponsors on their behalf. In exchange, Defendant agreed to, among other things, and Plaintiff understood that Defendant would: (1) provide medical treatment or services to Plaintiff and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII/PHI; and (3) protect Plaintiff's and Class Members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

186. The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand. Had Plaintiff and Class Members known that Defendant would not adequately protect its patients' PII/PHI, they would not have received medical treatment or services from Defendant.

187. Plaintiff and Class Members performed their obligations under the implied contract when they provided Defendant with their PII/PHI and payment was made—directly, through their insurers, or by their employers or plan sponsors on their behalf—for health care treatment or services from Defendant.

188. Defendant breached its obligations under its implied contracts with Plaintiff and Class Members by failing to implement and maintain reasonable security measures, protocols, and procedures to protect and secure Plaintiff's and Class Members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

189. Defendant's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered from the Data Breach.

190. Plaintiff and all other Class Members were damaged by Defendant's breach of implied contracts because: (i) they provided their PII/PHI, and payment was made—directly, through their insurers, or by their employers or plan sponsors on their behalf—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market;

and/or (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

**COUNT VI**
**UNJUST ENRICHMENT**

191. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

192. This claim is pleaded in the alternative to Plaintiff's current and future contract-based claims.

193. By its wrongful acts and omissions described herein, Defendant has obtained an undue benefit from the PII and PHI entrusted to it by Plaintiff and Class Members.

194. Defendant was aware of, appreciated, and/or understood the undue benefit it obtained from its transactions with Plaintiff and Class Members.

195. Defendant, prior to and at the time Plaintiff and Class Members entrusted their PII/PHI to Defendant for the purpose of obtaining health services, caused Plaintiff and Class Members to reasonably believe that Defendant would keep such PII/PHI secure.

196. Defendant was aware, or should have been aware, that Plaintiff and Class Members relied on its representations that the PII/PHI kept in its custody would be secure. Plaintiff and Class Members would not have contracted with Defendant had they known that Defendant's information systems were sub-standard for that purpose.

197. Defendant also knew or should have known that if Plaintiff and Class Members became aware of the substandard condition of and vulnerabilities in its information systems, Plaintiff and Class Members would be much less likely to seek its services.

198. Defendant failed to disclose facts pertaining to its substandard information systems before Plaintiff and Class Members made their decisions to seek medical care. Instead, Defendant

suppressed and concealed such information. By concealing and suppressing that information, Defendant denied Plaintiff and Class Members the ability to make informed decisions regarding their PHI and PII and received an undue benefit.

199. Defendant was unjustly enriched at the expense of Plaintiff and Class Members. Defendant received profits, benefits, and compensation, in part, at the expense of Plaintiff and Class Members, who provided their PII/PHI and for whose services payment was made directly, through their insurers, or by their employers or plan sponsors on their behalf. By contrast, Plaintiff and Class Members did not receive the benefit of their bargain because they sought healthcare services on the assumption that their private information would be secure in Defendant's possession.

200. Since Defendant's profits, benefits, and other compensation were obtained by improper means, Defendant is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized from these transactions.

201. Plaintiff and Class Members seek an Order of this Court requiring Defendant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendant from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## COUNT VII
## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
## Ind. Code § 24-5-0.5-1 *et seq.* ("IDCSA")

202. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein. Plaintiff brings this Count on behalf of himself and the Nationwide Class.

203. The IDCSA prohibits suppliers from engaging in deceptive, unfair, and abusive acts or omissions in consumer transactions. Ind. Code § 24-5-0.5-3(a).

204. Defendant is a "supplier" who engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of "consumer transactions," in violation of the IDCSA. As a regular part of its business, Defendant sells and provides medical and health services. It accepts payment, directly or from employers and plan sponsors, for healthcare services provided to patients, like Plaintiff and Class Members, at its medical, health, and other treatment centers. Marathon Health is an Indiana-headquartered supplier, and upon information and belief, its data security policies, practices, and decisions, including those that caused the Data Breach, were made and directed from Indiana.

205. In connection with its consumer transactions, Defendant engaged in unfair, abusive, or deceptive acts, omissions, or practices by, *inter alia*, engaging in the following conduct:

a. Failing to maintain sufficient security to keep sensitive PII/PHI of Plaintiff and the Class from being hacked and stolen;

b. Misrepresenting material facts to Plaintiff and the Class in connection with the sale of goods and services, by representing that it would maintain adequate data privacy and security practices and procedures to safeguard PII/PHI from unauthorized disclosure, release, data breaches, and theft, including but not limited to through the promises and assurances made in Marathon Health's Notice of Privacy Practices and Privacy Policy Center;

c. Misrepresenting material facts to Plaintiff and the Class in connection with the sale of goods and services, by representing that Defendant did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of PII/PHI, which requirements included, but are not

limited to, those imposed by laws such as the Federal Trade Commission Act (15 U.S.C. § 45) and Indiana's data breach statute (Ind. Code § 24-4.9-3-3); and

d. Failing to take proper action following the data breach to enact adequate privacy and security measures and protect Plaintiff's and the Class Members' PII/PHI from unauthorized disclosure, release, data breaches, and theft.

206. Defendant knew that its computer systems and data security practices were inadequate to safeguard the information of Plaintiff and Class Members, and that the risk of data breach or theft was highly likely. Nevertheless, Defendant did nothing to warn them about its data privacy shortcomings, and instead affirmatively promised that it would maintain adequate security. This was a deliberate effort to mislead patients such as Plaintiff and the Class Members in order to encourage them to pay for and obtain health and medical services from Defendant even though it knew that patient PII/PHI was vulnerable to a data breach.

207. The above unfair and deceptive practices and acts were done as part of a scheme, artifice, or device with intent to defraud or mislead and constitute incurable deceptive acts under the IDCSA.

208. As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and the Class Members suffered injuries, including the loss of their legally protected interest in the confidentiality and privacy of their PII/PHI, and damages.

209. As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and Class Members are now likely to suffer identity theft crimes, and they face a lifetime risk of identity theft and fraud.

210. Plaintiff and the Class Members seek relief under Ind. Code § 24-5-0.5-4, including, but not limited to, damages, restitution, injunctive relief, and attorneys' fees and costs.

**COUNT VIII**
**VIOLATION OF THE FLORIDA**
**DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"),**
**Fla. Stat. § 501.201, *et seq.***
**(On Behalf of Plaintiff and the Florida Subclass)**

211. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

212. Plaintiff and Florida Subclass members are "consumers" within the meaning of Fla. Stat. § 501.203. Marathon Health engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203 by advertising, soliciting, offering, and providing healthcare services to Plaintiff and Florida Subclass members.

213. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

214. In the conduct of trade or commerce, Marathon Health engaged in unfair, unconscionable, and deceptive acts, omissions, and practices, including the acts and omissions described in subparagraphs (a) through (d) of Count VII above, which are incorporated here.

215. Marathon Health's failure to maintain reasonable data security is an unfair practice under Section 5 of the FTC Act, 15 U.S.C. § 45, which FDUTPA incorporates. Fla. Stat. § 501.203(3)(a).

216. Marathon Health's misrepresentations and omissions were material because a reasonable consumer would consider the security of his or her PII/PHI important when deciding whether to obtain healthcare services from, and entrust PII/PHI to, Marathon Health.

217. As a direct and proximate result of Marathon Health's unfair and deceptive acts and practices, Plaintiff and Florida Subclass members suffered actual damages, including loss of the

benefit of their bargain, out-of-pocket costs for monitoring, and lost time spent mitigating the effects of the Data Breach.

218. Plaintiff and Florida Subclass members seek relief under Fla. Stat. §§ 501.211 and 501.2105, including actual damages, declaratory and injunctive relief, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant Marathon Health as follows:

A. Certifying the Nationwide Class and Florida Subclass as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, individually and on behalf of the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: November 9, 2026

Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger (IL Bar No. 6303726)
**MILBERG, PLLC**
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Scott J. Falgoust (*pro hac vice* forthcoming)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, Louisiana 70124
Telephone: (919) 585-5634
Email: sfalgoust@brysonpllc.com

Andrew W. Ferich (*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
Email: aferich@ahdootwolfson.com
*Counsel for Plaintiff and the Proposed Class*